and get started. Oh, and I want to thank Tulane for having us. It's an honor to be here. Um, so we'll go ahead and get started with case number 23-50319 Lettuce Entertain versus Hotel Magdalena and the classroom. Tony McShane on behalf of Lettuce Entertain You Enterprises. I'd like to reserve five minutes of my time for rebuttal. Your honors, this is not the rare case where summary judgment was preordained for the defendant. In fact, there's ample record evidence that the jury could find for Lettuce Entertain You Enterprises on every likelihood of confusion digit. Notwithstanding, the district court made its own findings and to do so, weighed competing evidence to reach factual findings, weighed evidence most favorably to the defendant, and disregarded substantial record evidence supporting Lettuce. Now, our brief details this to a great extent, so I'd like to focus my comments this morning on three digits in particular. The strength of the mark, the similarities of the mark, and the outlet and purchaser identity. We think these best illustrate how the district court's judgment went astray. With respect to strength of the mark, the court's error is clear. The court noted that Lettuce's Summer House restaurant could be found by a jury to be arbitrary and therefore strong. You should have stopped there, but the court did not. In terms of stopping there, why am I wrong to think a customer wouldn't really have confusion about going to a restaurant in Texas when you don't have any in Texas and the name is as nondistinctive as Summer and House? Several answers to that question. Let me do the last half of that question first. Summer House is not distinctive of restaurants. Lettuce doesn't sell Summer Houses. It sells meals. And so as a matter of law, Summer House is a distinctive arbitrary term. Even the district court found that and should have allowed the jury to weigh that. After all, the registration is incontestable now and therefore is considered strong as a matter of law. But we are asking, would a reasonable customer be confused? When they go into this hotel in Texas and they see the hotel's restaurant's called Summer House on Music Lane, would they somehow think they're actually walking into your client's restaurant when you don't have any in Texas? Two answers to that question. Absolutely yes. There's an instance of actual confusion in the record where a patron of the Summer House restaurant in Austin, the Magdalena one, thought they were walking into a Lettuce Entertainment Summer House restaurant. In Streamline, one instance of confusion is enough to find a likelihood of confusion. At a minimum, in Rex Real Estate, that should be weighed by the jury and not disregarded by the judge. But the breadth of your question, which I need to get to, is whether an individual in Texas would be confused. And the answer to that question is really also found in the record, which the jury should have been given a chance to weigh. Both parties serve national patrons. There's evidence in the record that Lettuce Entertainment Services has served meals in the Summer House restaurant to residents of Austin and Texas. And this is on the theory that because they compete on the internet for booking? Is that the logic? This is on the theory of how they travel and how they serve. So it's not just internet booking, but both parties have national customers. Both parties market nationally. Lettuce Entertainment markets... But is your marketing... It's all about California vibes and food. So Summer House, can we really just extract it from the rest of the tag, which is the one... And Austin is music lane, whereas your company is saying Summer House of... And then it's significant that it's the California vibe. Fair to say or not? Can we really take away just the phrase Summer House, extract that and say, well, that's violative? I think the question exactly illustrates the problem with the district court's decision. The meaning of the marks, the vibe that's taken away by the manner in which the parties market is for the jury to have impact. It's the jury to have weighed and the jury to have decided. But sometimes, I mean, you're familiar with the matchup case? I'm not, Your Honor. Mayonnaise and ketchup. Courts do allow summary judgment when there's no reasonable juror that could be confused. Fair to say? Fair to say. I mean, in extreme last years, the term that this court used was preordained. Well, and I want to add to this question. I mean, the name of your trademark is Summer House Santa Monica, which ain't Texas. So I'm not understanding why that isn't different from Summer House on music lane in a hotel. Because typically, the hotel is the one that owns that restaurant, when it's just like one restaurant in a hotel. So how are those the same, as opposed to everything is just Summer House with no additional name? If anything, the Summer House adds to the arbitrariness of the registered incontestable mark. But it's the dominance of Summer House, right? I mean, with respect to the similarity of the marks, the judge's error was very interesting. He actually stated that aside from the dominant terms, the marks have many differences. It's like asking Mrs. Lincoln how she liked the play, right? You can't overlook the dominance of the term Summer House, right? And so to answer your question, Your Honor, is Summer House, wherever it appears, will be seen as yet another iteration of what is the Summer House restaurant. Whether it's the Santa Monica vibe, whether it's the one at Disney Springs, whether it's in the airports, or whether it's the one on music lane. And that was the problem with T. Quinn, the poster in Yelp, that identified the fact that she was confused. So I think the answer to the question is just that, Your Honor. The impact of the term Summer House, and the fact that both parties use it, is something that the jury had to weigh to determine whether they thought there would be a likelihood of confusion. What would you say is the best authority for us to understand, among the various digits of confusion, which are the predominant? How do we decide which to weigh? Because I think it's fair to say the district court weighed geography and thought, you don't have a single one in Texas less likely to be confused. And then as I saw, the district court also put a little weight on the fact that the hotel had called the earlier restaurant Summer House, second point. And I want you to address that, because that may not be true factually. But the third point also was the third party use issue. That there are other people, you may be litigating against them, but there are other people around the country that use Summer House to designate a restaurant. So the primary legal question is, what's the best authority you would point us to in terms of which digits matter more? And then you heard me say, what I think are the three digits that district court thought should weigh more. Right. So the first answer to the question is extreme lashes in this court's recent decision in Rex Real Estate, where there was evidence of potential impact of confusion, potential third party use, potential overlap of channels of trade and of identities, all of which had to be, under those decisions, had to be weighed by the jury. So both of those cases stand for the premise of this case, so you go back to the jury. All weighed equally, is that correct? Sorry. All weighed based on the jury's holistic evaluation of the digits as a whole. It's not a metaphysical decision where we add up three versus four and the math determines the victor. Quite the contrary. It depends on the nature of the case. And that's the purpose of having digits in this holistic way, and that's the purpose of having the jury. Because you need the room in the jury to determine the relative weight of these and what weight to give other factors and which factors to give less weight. Right? This has nothing to do with the law, but where did the term digits come from? Your Honor, it's a little mystery to me. In most of the other circuits we talk about likelihood of confusion factors. The Fifth Circuit is the one circuit that uses digits. I just think they're interchangeable symbols. Because it's one through eight. Fair enough. Those are digits. Sure, maybe one through 10 would have been a more natural reason to say digit, but in any event, it's a synonym for factors, and it's just individual considerations we need to make. Judge Higginson, let me finish answering your question, if I may. With respect to third-party uses, that could be an important determination for strength. Strength alone, right? The third party are not in court here today. There's clearly a question of overlap between somewhere else for lettuce and somewhere else for Hotel Magdalena. But the law is very clear. Third-party uses are relevant to strength, and in order to evaluate them for strength, there must be evidence of scope and substantiality of those uses. There must be an indication of the duration of the use, the size of the use, the sales associated with the use, the amount of advertising. None of that is present with respect to third-party uses in this case. There are two, one on either coast, one in Rehoboth, Delaware, and the other in Corona del Mar, California. Those are the only record, the only testimony before the court of a third-party use. And there we only have, in Rehoboth, we have the 30B6 deponent stated that the business had been open, but they advertise only locally. Nothing with respect to sales in the record or advertising expenditure or exposure to customers. On the west coast, in Corona del Mar, they did no advertising. The record says that they advertise by word of mouth and social media, but nothing actively. So you can't look at those two uses and say they have a profound impact on the strength of Lettuce's Mark. Not when the record evidence also shows that with respect to lettuce, substantial growth of the brand, expansion into international airports, 100 million. When you say substantial growth, the district court relied on the northern district of Texas case Firebirds. Yes. Are you familiar with Firebirds? I am. Because I didn't see it in your brief. Right. Okay. So what are your thoughts on that? Because if I'm right, that in Firebirds, there were 50 restaurants, whereas you just have four around the country. Right. And you want to speak to that? I do. In Firebirds, there wasn't any countervailing evidence of the strength of the Mark. So it was really a zero to one game, right? I also think that in Firebirds, there was not a good factual showing of the scope and substantiality of the third-party uses. So that district court opinion, I think, is something difficult to rely upon because it goes against Extreme Lashes, Rex Real Estate, with respect to how we evaluate the impact of third-party uses on the strength of the plaintiff's Mark. So I think that that case is interesting. I understand it was cited by the judge. We didn't treat it in our brief for that reason. I wanted to point out in my opening remarks I said three things. I'd like to get to at least one or two of the other two. With respect to similarity of the Marks, the judge's decision was entirely contrary to Extreme Lashes. Extreme Lashes teaches that you have to look at the dominant components of the Mark, right? What the judge did is he looked past the dominant component, emphasized the non-dominant features, and failed to consider the Mark as it appears in the proper commercial context, the way consumers would see it. He actually put them in the opinion. The Marks. Yeah. Side by side. On page 13. Correct. So you can see the difference. That's substantially our point. It is error to compare the Marks side by side. The Marks must be considered the way a customer would see them. They wouldn't see them side by side. They'd see them when they leave O'Hare International Airport or Charlotte, Douglas, or Orlando and then travel to South by Southwest and stay at the Hotel Mandolina. If you're talking about the multi-millions of people in the United States, I think almost anything could be a mistake that somebody makes. You might think you went to X mall and it was really Y. I mean, so I guess I'm struggling a little with the notion that everything's always going to be a confusion. I don't think everything, Judge. And I would concede there are cases where summary judgment would be appropriate. If the defendant in this case named their bar Joe's Bar and Grill, no matter what other factors lined up, I would think summary judgment would be appropriate. But more to the point, with respect to an incidence of confusion or whether there was an indicia from which a jury could find there is confusion, like the overlapping customers, the overlapping market, the service to people in the same markets. But the overlapping market is America. But that's all for a jury to weigh is our point. Okay. But I'm just trying to make sure I get that. When you say Joe's Bar and Grill wouldn't be? Is Joe's Bar and Grill Summer House? No, no. I was contemplating a circumstance where summary judgment would be appropriate based on some of the factors. And it is conceivable that one of the factors, like similarity of the markets, could be so different where summary judgment might be appropriate. That's not this case. In this case, we have Summer House versus Summer House. We don't have Summer House versus Joe's Bar and Grill. But it's Summer House on Music Lane. Which simply identifies the next location of the restaurant. A reasonable juror could certainly find, oh, I love Summer House. I've eaten at them. This is the one on Music Lane. And more to the point, Judge, and this is something from the Elvis Presley case where they found bad faith intent or a juror could find bad faith intent by the way the defendant presented the mark. It's not Summer House on Music Lane.  It's Summer House on Music Lane. They whisper on Music Lane. If they truly adopted a term to distinguish the mark, it would have been given equal prominence. It would have been given some presence that a jury could latch on. If you walk into the restaurant at night, you can't even see the on Music Lane. With just a little time left, you were going to speak to whether or not the earlier version of the restaurant in the hotel was called Summer House. Oh. Is that significant or not? It's absolutely not. There's nothing in the record evidence about it. The reality is it was a restaurant that closed 50 years ago in the 70s. There's no circumstance in the record that shows that the- But I thought it was a Willie Nelson place. 50 years ago. Well, Willie Nelson's still on people's mind. Fair enough. But there's nothing in the record that shows that they marketed it to associate with Willie Nelson, or that they marketed the restaurant to harken back to that Terrence Motor Inn restaurant, where people came to colloquially call it a Summer House. I mean, is that intended? So you're saying if these law clerks were law clerks in Austin, they would not know the Willie Nelson vibe there? I'm saying if you received marketing and treatment to come into the restaurant in Austin, you would have no idea it related to Willie Nelson or to the old Summer House. There's no indication that anyone ate at the old Summer House, anybody remembered the old Summer House. There's no indication that they did that in the 70s, in the 80s, in the 90s, in the aughts, in the tens, or today. So that's the point with that. It's a nice thought. It might have been a kernel, but it never became marketed. It never became presented to the consumers. Fair enough. You've saved time for rebuttal. Thank you. Thank you. All right. So now we will hear from John Gabrielides. I'm sorry. That's quite all right. I'll let you pronounce it for Hotel Magdalena. May it please the court. My name is John Gabrielides. I'm here with my colleague, Caitlin Biscoe, representing the defendant. I'd first like to acknowledge for the court that we did not file a brief, and we apologize for having made the court's job a little more difficult. And why not? Yeah. So we discussed this with our client, and I am constrained by the ethical rules and confidentiality to give you the explanation, Your Honor. I apologize for this, but I have to abide by those rules. We have not received our client's authorization to explain, but I do acknowledge, Mr. Biscoe and I, that we have made the court's job more difficult. We apologize. I'm here to answer all the court's questions and give as much detail as I can, including record sites. Well, I mean, I think you need to start with your opponent has spoken very well of the fact that summer house and summer house. Well, that sounds like the same. Okay. So what's your response to that? Very good. The marks must be considered in their entirety. Fifth Circuit law, as well as every other circuit's law, is clear on this. Their mark is not summer house. They neither use it that way, nor did they register it that way. Had they wanted to claim protectable rights in summer house, they would have used it that way, and they would have registered it that way. They did neither. They can't now rewrite history and say that their registration for summer house Santa Monica is really summer house. Nor can they tell the court with credibility that anybody's whispering Santa Monica or on music lane. This is an alluring idea, but the record doesn't support it. All of the use by the parties is with their complete marks. But there is none. They don't have one in Santa Monica. They do not, and this is what makes this case unusual. Judge Higginson, you asked my colleague, Mr. McShane, you know, what are the factors that their side of the case would like you to focus on? I'd like to tell you the factors that we would like you to focus on that we think make this case. Well, I'll just interrupt and say, what law tells us which ones to focus on? Because intuitively one might think you'd look at the similarity of the mark and similarity of the service, but those would be the two that are strongest against you. You'll dispute that, but they're both restaurants, and they both do have in all caps very prominently summer house. They do. So what's the case that tells us which digits matter more than others, or is that not the approach? I don't think that there's any case that does that. I think all the cases say, first of all, these digits are guides. We're not playing a game of tallying one up against the other and then saying who wins. They're flexible. We've seen that in lots of the case law, including, most importantly, Springboard's case, which is the case that we believe is the most instructive for this court. But at least as to one digit, would you agree the district court erred legally? Once it said a reasonable juror could have found the mark to be arbitrary, it didn't then grant that in the light most favorable to your opponent. Well, first of all, it went on to say, but it's more likely that they would find it suggestive. So I think what Judge Pittman was saying is it's possible, but this is the more predominant way to get it. But don't you, at the summary judgment, have to say whatever's possible they get? Sure. You know what, Judge Atkinson? I'm okay with giving them that. Okay. So I interrupted you. You tell me what you would emphasize. Yeah. A reasonable customer would be confused because primarily what? They wouldn't. Would not. They would not be confused. First of all, nobody in Austin can go into Summer House on Music Lane and have any recollection of going into Summer House Santa Monica. They don't exist here. The closest restaurants are over 1,000 miles away. They have no strength of the mark here in Austin. Well, but what about the fact, so, you know, when I was a law student, we didn't have all this online stuff and so on and so forth. So you would have had to go to California to know about it. Now you can sit here in New Orleans and look on your phone and see the whole, well, the whole world, but certainly the whole country pretty thoroughly. And so given the advertising kind of in the same place, why couldn't you know about it even if you've never traveled outside of New Orleans? Well, the Internet has not democratized trademark law to the extent that just because two companies are both on it, they're advertising in similar channels. In fact, there's a case that talks about this expressly. Yeah, the Umami Burger case, which is out of the Western District of Texas, says consumers' exposure to Internet media is extremely self-selected. In other words, people on the Internet are looking for something and they will find it. If somebody's looking for Summer House Santa Monica, they will find Summer House Santa Monica. If they're looking for Summer House on Music Lane, they will find that. Yeah, but I mean, what if you're just looking for a restaurant and you like certain kind of food? Would you see both of them? Well. I know I realize you're in different cities, but like if you just said, I'm going to have my birthday, I'm going to turn, let's see, in this room, 25, and I want to go and have a really big, nice meal somewhere in the U.S. Yeah. Would you find them both at the same time or are you saying, nah, you would really have to be searching by a city? You've got to be drilling down, not only by city, but the evidence in the record is that the two companies use different reservation platforms. We, me and my client, rely on Resy, no other reservation platform. They rely on OpenTable. No other reservation platform. That is different. And I have the record sites if the court would like that. So this idea that there's overlap is not supported by the record. We have not seen any common customer in those two. Okay. But what if, you know, I was a law student here and then I made a trip to California and I went to that summer house and I was like, wow. And then I somehow was traveling to Texas as well. And so I looked up to see because I thought maybe they're across the country and I looked up summer house Texas. Wouldn't this show up? Anything is possible. But the law, including in this circuit in particular, says it's what's probable that the law is designed to protect, not simply what's possible. I grant you, Your Honor, that is possible. That could happen. But the question is how probable is that to happen? That's what the law is looking at. The Lanham Act is not designed to prevent all confusion of all people. It's what's reasonable and probable. Right, but the issue before us is should it go to a jury. Sure. Without the appellee brief, how would you just, your extreme latches, capiche, recs, each, basically our court is saying it's the, quote, rare and outlier case. Well. Correct or wrong? I don't think so, Your Honor. First of all, both of those cases, recs and extreme, are distinguishable, and I will explain how, but one thing. There are five cases at least in which this court has affirmed a finding of no likelihood of confusion on summary judgment. And they are, and again, I'm sorry that I don't have the brief to tell you, but the first names of the cases are Perry, Springboards, Fetzer, Batiste, and King. It's less our help, it's more opposing counsel really has had no opportunity to look at these. And again. What are they, Perry, Springboard? Perry, Springboard, Fetzer, F-E-T-Z-E-R, Batiste, and King. And the King court expressly made this comment, we reject King's argument, the plaintiff's argument, that the issue of confusion may not be resolved on summary judgment, notwithstanding certain of our cases that suggested the contrary. There must be a minimum threshold evidence on the factors of confusion. Well, they have two confusions. Well, one of them is by a real estate developer who is not a consumer, and he was their real estate developer. So I think that taints that. So you think that's vague? Well, I just don't think it's a consumer confusion. Okay, well what about the other one? Well, this is a Yelp review, and first of all, neither the quality nor the quantity of that evidence I think is enough to get them over the hump. It's one instance of confusion that we couldn't even really cross-examine because it was on a Yelp review. And I put aside the hearsay issue of that. It's simply somebody who said, hey, I went there expecting it to be the plaintiff, but I got there, I looked at the menu, and I realized it wasn't. So whatever confusion she had was dispelled immediately upon seeing the menu. Is it true your client sells paraphernalia that is just Summerhouse? The pen? The pen is, they don't sell it, and that is the one piece of evidence in the record, Your Honor, that shows Summerhouse alone, and I would submit that that is an outlier. I mean, nobody uses a pen to promote their trademarks in a trademark sense. We didn't register, we're not claiming trademark rights for Summerhouse. Well, Tulane has a nice pen. They certainly do, and I'm using it. So the answer to sort of, how many restaurants are there, Pancake House, Waffle House? Okay. It can't be that you can say, oh, Waffle House on St. Charles Avenue, and you're not infringing. But is your point that they registered it with the locational tag themselves, and therefore it's fair game? Our point is that they registered it as a whole, Summerhouse on the entire market, and they are stuck with that. They cannot now claim that what they really meant to protect was a truncated version. I mean, that would upend the patent and trademark office. I mean, if I could tell my clients, yes, we're going to register your entire market, but don't worry, you have rights in fewer than all those words, I'd be a hero. That's just not the way trademark law works. They made a conscious choice. And in that same vein, I will point this out, which I find unusual. Before, and this is all on the record, before they filed their trademark application, they ran a search report. Very common, right? And in that search report, a number of other restaurants were identified that used Summerhouse in their names. They were Summerhouse in Lakewood, Ohio, The Summerhouse in Nantucket, Maryland, Summerhouse in Wisconsin, and The Summerhouse in Massachusetts. And these are all at pages 245 to 262 of the record. So in this search report, there are, and there's one other, in the Robles Beach, they went ahead and filed their application anyway, meaning that they believed that Summerhouse Santa Monica was distinguishable over those. You must find an oath saying, hey, I'm not aware of any other marks that would conflict with my registration of this mark. Well, if that's the case, if they're telling the Patent and Trademark Office under oath that these marks, Summerhouse, The Summerhouse, Summerhouse, they're not infringements, we're not either. They can't have that both ways. You could have introduced expert or survey evidence to show lack of confusion. It's not our burden to do that. We could have. It was their burden to prove the likelihood of confusion. They didn't run a survey for reasons how... Well, but it was the summary judgment. Pardon? It wasn't a trial. It was a summary judgment. But discovery had closed. So they had the opportunity to run the survey, both on the likelihood of confusion and on the strength of their mark, by the way. How many, would you agree there are only two third parties? Oh, no. No, there's seven. Seven. And, again, I can give you the record sites if you'd like, but they are Summerhouse in Rehoboth Beach, Delaware, Summerhouse Corona Del Mar, which, by the way, opened before the plaintiff opened its restaurant. So did the one in Rehoboth Beach 36 years before the plaintiff opened its restaurant. Siesta Key Summerhouse in Siesta Key, Florida, coexisting with this one, too. Then there's the ones I mentioned a little while ago. Summerhouse in Lakewood, Summerhouse in Massachusetts, and Summerhouse in Wisconsin. So there's seven. And the Springboard case is quite analogous here because it found that there were six third-party uses and characterized that as widespread evidence of third-party use. And this court affirmed summary judgment on a likelihood of confusion, even though the district court's summary judgment decision was not based on likelihood of confusion. Let me ask you this in connection with the advertising media identity digit. Have we, this circuit, ever required advertising channels to overlap geographically when the party's products are primarily sold as these are in-person? I don't believe so, Judge Winger. I don't believe so, but I don't think that's dispositive or even terribly relevant in this particular case. I mean, these restaurants don't operate in the same geographic areas. They can advertise wherever they want. Nobody's going to have a common experience. And I acknowledge Judge Haynes. There's always the possibility that somebody traveling can come across these, but that cannot be the overwhelming majority of the consumer experience. Those have to be a small percentage, a very small percentage. Well, I think what you're also saying is it's a little different from something on where I could buy something online. Buying food online from California would be a little more complicated than going to a restaurant down the street. You are looking for something specific when you say, hey, I'm going to be in California. I want to find, you know, American fare, something like that. The likelihood of both of these coming up on that search, infinitesimally small. Is it zero? No, it's not zero. But the law can't deal with everything. It's dealing with what's probable. But I guess what I'm saying is if I was just trying to order online a shirt, that would be a little bit different because I could get that from anywhere. Let's just say in this country, I suppose I could get it from another country, but let's make it simple. Versus if I wanted to eat a sandwich right now, it'd be a little hard to get that from California. It might be a little easier to go down the street here in New Orleans. Yes, our eating decisions are highly location-based. Let me say it that way. I think that answers your question, I hope. Yes. I mean, when we're talking about restaurants as opposed to maybe if you're trying to go on a diet, that they're going to send you this monthly food or whatever. Right. I'm talking about like right now I want a sandwich. Right. That's hard to get online from some distant place. Right. If I need a new tie, I don't really care where they're located. I look at the tie, and if it's Miami, it's Miami. But when I'm eating, I want to be able to get what I want where I want. So it's much more location-based. And again, what makes this case unusual from all the others, including, you know, Mr. McShane mentioned Rex and Extreme Lashes. And the Rex case, both parties did business in Texas. Yes. They were both here. I was on that panel. Okay. And the plaintiff used its mark throughout the U.S. and in other countries. They have three locations at the time, the relevant time. Okay. Three. None of which is Texas. All right. So I don't think Rex does much for them. And in Extreme Lashes, there was no evidence in that case either that they were in separate geographic areas. Now, there's no finding the other way either, but you would have expected the court to say, well, they're in separate geographic areas. The vast majority of the cases don't have these facts, where we have a plaintiff trying to enforce its rights in an area that it does no business and claiming that it has a strong mark there and that customers are likely to be confused there when most of them, the overwhelming majority of them, will have had no idea about this restaurant. Is there anything in the record that they've got a hotel next door or nearby? There's nothing in the record. I thought there was. Yeah, I had that same impression. But it wasn't a summer house. It was something else. Oh, it was ABBA. Okay. Okay. So are they, I mean, is that their concern, that they've got this other place even though it's a totally different name and they want everybody to go there instead of the summer house in Austin? I believe they're trying to piggyback on this vast network of restaurants. They have over 100 restaurants. It's not a small operation. And saying that because they have this network that extends throughout the country, that somehow inures to their benefit for this mark. Trademark law doesn't work that way. If they're not using this mark here, it doesn't really matter what other marks they're using for some other restaurants here. The fact that they may have an ABBA here doesn't somehow rescue. But if I was walking down the street to go to a restaurant and I saw ABBA and I saw a summer house and I thought, oh, yeah, in California I went to a summer house, I'll go in there, is that what they're concerned about as opposed to I would just go eeny, meeny, miny, moe? I think what they're concerned about is they see the ABBA and they say, oh, I know that's connected with Summer House on Music Lane. That's where I think their theory goes, that because ABBA is here and it's theirs, that consumers connect ABBA with Summer House Santa Monica and therefore they get confused when they see Summer House on Music Lane. I don't want to speak for Mr. McShane, but that's how I understood their argument. Maybe he can address that in his rebuttal, because it doesn't make sense to me that I would connect restaurants just because they're close to each other. In fact, I would think that they're not the same. Well, again, I really don't want to... Maybe I'm not like everyone else. Well, I don't want to mischaracterize their argument. No, that's not a maybe. I'm not like everyone else. All right, so what do you mainly want us to really know from you that we don't already know? So I think the three factors that I think really drive home the correctness of Judge Pittman's decision are the weakness of their mark, both because of the excessive third-party use. That testimony is simply unchallenged. There are seven of them. In the case there of springboards and the fact that they don't use it here, that also drives home the weakness of the mark in Texas. Second is the geographic separation, where we have two restaurants that simply do not have common locations. And by that I mean over 1,000 miles apart. The likelihood of confusion is not probable. That's the Umami Burger case, which is a district court case. But the Fifth Circuit, in our research, has not really spoken on this particular issue. And the last is that there's de minimis evidence of confusion. The real estate developer, their real estate developer, simply is not probative of anything. We're left with one Yelp review. And I would point the Court's attention to the Society of Financial Examiners, where this Court reversed the entry of summary judgment for the plaintiff, where there were 12 instances over five years. So it seems to me that if the Court's saying, even if there's 12 instances over five years, you can't find a likelihood of confusion on that record, we have one here, one. And I don't think it's a stretch to look at that one Yelp review as qualitatively, not the same as a consumer giving a declaration on summary judgment about his or her confusion. We don't have that. We have a Yelp review. And I would like to point out one other issue. Mr. McShane made a point about the side-by-side comparison. Here's what Judge Pittman didn't do. He did not say, consumers walk down the street and they see both of them side-by-side and they can easily see the two. And then he went on to analyze it. That would have been error. He didn't do that. All he did was he said, here's what this mark has and here's what this mark has. There's no other way to compare two marks, period. Every likelihood of confusion case does that. Because as a practical matter, how else are you going to compare them? But what he didn't do was the impermissible side-by-side comparison. So I just want the record to reflect that. I have no further comments. My time is up unless the Court has any more questions. All right, thank you. Thank you. We'll hear the rebuttal. First, if the Court would like, we'd be happy to prepare a supplemental brief on the cases that were just mentioned by Mr. Gabrielidis. We looked at the case log, we looked at the judge's decision, and identified the most relevant cases and briefed them for the Court. So I presume there's a good reason why those didn't figure into the Court's decision or ours, but we'd be happy to supply a supplemental brief if the Court finds it necessary. Well, if there's any case you think we need to know more about that we don't already, we're happy for you to follow. But you need to follow it in the next few days. Fair enough. So I've got a number of issues I'd like to bring up. This issue about whether or the effect of Summerhouse, of there not being a lettuce Summerhouse restaurant in Texas, the third-party usage, and the confusion... History, primary factors. Yeah, yeah. With respect to Summerhouse not being located in Texas, the issue is not whether there's a physical location in Texas, or, as the judge required, that there's one overlapping individual that ate at both. The question is whether there's an identity of outlets, an identity of purchasers. And what the record shows is that lettuce has a substantial number of Summerhouse diners from Texas and from Austin. The open table reservation shows 11,000 covers made from residents in Austin that ate at a Summerhouse restaurant. So when they were traveling to Chicago, they went on open table, or they went on resi, or they went on both, and they made a reservation and actually dined there. The Yelp reviews, the record shows myriad Yelp reviews from people residing in Austin and in Texas commenting on eating at a Summerhouse restaurant offered by lettuce. So clearly there's evidence that they were reaching there. The ABBA restaurant, to explain that, what the record shows is that all of the lettuce restaurants cross-promote. So it's a significant way they cross-promote.  They collect, for example, e-mails, and they send e-mails. So the record shows the number of e-mails in Texas to residents. But with respect to ABBA, the ABBA restaurant a block away promoted all of the Summerhouse, all of the lettuce restaurants by giving a promotion to join the frequent diners and a promotion identifying the various Summerhouse lettuce brands to every diner for a lengthy period of time. So do you get points by going to ABBA? Then you also can get points at Summerhouse, Santa Monica, and then somehow get some discount at something if you get enough points? Is that the idea? That's correct. And you can dine at ABBA and be promoted to dine at Summerhouse restaurants. But it would list where they were, right? It wouldn't list Austin? Oh, that's correct. Okay, so I wouldn't be confused if I thought, oh, I need to get some more points, then I better win. The next time I'm in California, I'll go there. The next time I'm in Ohio or whatever. But you could look at that check listing and see that there was a Summerhouse, walk across the street, and assume that was one of the new Summerhouses. But not if it said the city. Does it not say the cities? Sometimes it does, and sometimes it doesn't. I mean, certainly if you went on, for example, if you joined the Free for Diner program, downloaded the lettuce app and pulled it up, you would see the cities for sure. But the issue, of course, is the expansion of the restaurant. So in 2013, they opened in Chicago. 2016 in Bethesda. 2019 in O'Hare. 2021 Charlotte Douglas Airport. 23 Orlando Airport. Since then, Disney Springs and the Durango area of Las Vegas. So as you are becoming a member and aware of Summerhouse restaurants or lettuce restaurants, the next one you see is likely to be perceived as associated with earlier ones. So the point, Your Honor, is both on a national level and on a local level, there's significant record evidence showing overlap of customers and overlap of marketing. And the point is that that is the record evidence that the jury should have been entitled to weigh. With respect to third-party usage, counsel overstates. The law is clear. A reference in a search report does not establish use. What you need to look at is the record evidence of actual use. There's two pre-existing uses that would have framed the scope of our registration. That's the Rehoboth and Corona Del Mar we've talked about. The other uses are either static web pages, which don't really establish anything, certainly not with respect to substantiality of the use. There are remote geographic locations as well. Southwest Massachusetts, for example. Do you want to speak to his sort of indivisibility argument that you registered Summerhouse of Santa Monica? Right. It turns the issue on its head, right? So when Summerhouse Santa Monica was adopted, the trademark office required that Santa Monica be disclaimed as descriptive. And so what's left is the dominance of Summerhouse. And the law is clear that when you compare two marks, you compare based on the dominant features, not focusing over much on the dissimilarities. The other aspect, Judge, is that there's a common law claim for Summerhouse, so that the court also dismissed. So we have Summerhouse Santa Monica being infringed by Summerhouse on Music Lane, and we have the reality that in social media customers, even in our own social media postings, both parties refer to themselves as Summerhouse. And so there's common law claims of Summerhouse versus Summerhouse. So either way you look at it, the Summerhouse compared to dominance of the two marks, results in that factor or that digit leaning in favor, or at least a jury could find it leans in favor of lettuce. Or you have the common law claim, which should have been dismissed with the same grounds. And your time is up. Thank you. We could spend all day, but we are not able to do that. So thank you, and the case is now under submission.